RECEIVED

Filed on 6/17/2021

eab/ind. 2019R01204

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

At: 8:30 _3:21 p._ .m

WILLIAM T. WALSH

CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Robert B. Kugler |
| | : | |
| v. | : | Crim. No. 21-487 |
| | : | |
| | : | 18 U.S.C. § 1343 |
| JOSEPH GEROMINI | : | 15 U.S.C. §§ 78j(b) and 78ff(a); |
| | : | and 17 C.F.R. § 240.10b-5 |

**I N D I C T M E N T**

The Grand Jury, in and for the District of New Jersey, sitting at Trenton,

charges:

**Counts One through Four**
**(Wire Fraud)**

**Relevant Entities and Individuals**

1.      At all times relevant to this Indictment:

a.      Defendant JOSEPH GEROMINI ("GEROMINI") was an

individual residing in or around Linwood, New Jersey.  GEROMINI began

consulting for "Victim Philadelphia Company" in or around July 2018 through

a company GEROMINI founded, Xanitos Marketing Services, LLC ("Xanitos").

From in or around August 2018, until his employment ended in or around May

2019, GEROMINI held the title of Chief Operating Officer ("COO") of Victim

Philadelphia Company.  As the COO of Victim Philadelphia Company,

GEROMINI controlled Victim Philadelphia Company's bank and debit card

accounts, and was responsible for, among other duties, soliciting investments

in Victim Philadelphia Company through debt and equity fundraising.

b.      Victim Philadelphia Company was a technology startup headquartered in Philadelphia, Pennsylvania, which specialized in the development of point-of-care diagnostic testing of various diseases. Victim Philadelphia Company raised approximately $2.25 million of investor funds in connection with (i) a debt financing totaling approximately $400,000 in or around August 2018 (the "convertible note raise"), and (ii) a separate Series A equity financing totaling approximately $1.85 million in or around October 2018 (the "Series A raise").

c.      "Victim Investor 1," an individual who resided in Chester Springs, Pennsylvania, invested approximately $900,000 both individually and as a member of a pool of investors, in connection with the convertible note raise and the Series A raise.

d.      "Victim Investor 2," an individual who resided in Center Valley, Pennsylvania, invested approximately $375,000 both individually and as a member of an angel investor group, in connection with the convertible note raise and the Series A raise.

e.      Xanitos was a single-member company owned by GEROMINI, and registered to do business in New Jersey.

f.      "Bank A" was a financial institution headquartered in Charlotte, North Carolina, that provided its customers with, among other products and services, depository, debit, and credit card services.

g.    "Bank B" was a financial institution headquartered in New York, New York, that provided its customers with, among other products and services, depository, debit, and credit card services.

h.    "Bank C" was a financial institution headquartered in San Francisco, California, that provided its customers with, among other products and services, depository, debit, and credit card services.

## The Scheme to Defraud

2.    From at least as early as in or about July 2018 through at least in or about May 2019, in the District of New Jersey and elsewhere, the defendant,

JOSEPH GEROMINI,

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, as more fully set forth below.

## Goal of the Scheme to Defraud

3.    The goal of the scheme and artifice to defraud was for GEROMINI to orchestrate an embezzlement plot to fraudulently obtain hundreds-of-thousands-of-dollars from Victim Philadelphia Company before diverting those stolen funds for his personal enrichment.

3

## Manner and Means of the Scheme to Defraud

4.      It was part of the scheme that, shortly after being hired as Victim Philadelphia Company's COO, GEROMINI arranged to terminate the banking relationship between Victim Philadelphia Company and its financial institution, Bank C, in favor of opening a commercial checking account with a different financial institution, Bank B, over which account GEROMINI would exercise nearly exclusive and total control.  Following the opening of a Victim Philadelphia Company account with Bank B in or around August 2018, GEROMINI proceeded to draw funds from this account as if it were his own personal checking account, routinely preparing several-thousand-dollar wire transfers, while directing another Victim Philadelphia Company employee, "Person 1,"  to execute or approve those unauthorized wire transfers, from Bank B for deposit into GEROMINI's personal Xanitos account at Bank A. GEROMINI prepared, or directed Person 1 to prepare, many of the unauthorized wire transfers in amounts approximating his monthly gross compensation in an effort to disguise his misconduct and evade the scrutiny of Victim Philadelphia Company.

5.      It was further part of the scheme that in connection with executing unauthorized wire transfers from Bank B to Bank A, GEROMINI would complete a Bank B wire transfer form, which included, among other information, a "Memo" line, in which GEROMINI frequently mischaracterized the wire transfers as salary-related.

4

6.     It was further a part of the scheme that when GEROMINI directed Person 1 to prepare wire transfers on his behalf, or to authorize wire transfers that GEROMINI had prepared on the Bank B online portal, GEROMINI frequently misrepresented to Person 1 that the purpose of the transfers was to compensate GEROMINI for his employment with Victim Philadelphia Company.

7.     It was further part of the scheme that GEROMINI reviewed and approved an outside accountant's preparation of Victim Philadelphia Company's monthly payroll before authorizing the accountant to direct a third-party company to pay Victim Philadelphia Company's employees, including GEROMINI, according to GEROMINI's instructions.  Having knowledge of Victim Philadelphia Company's payroll, Geromini accordingly knew that the unauthorized wire transfers were not related to, but, in fact, were in excess of his compensation.

8.     It was further part of the scheme that GEROMINI repeatedly misused Victim Philadelphia Company's Bank B debit card to pay for personal, non-business related expenses.  GEROMINI used the debit card in this manner both by making unauthorized personal charges to the debit card and by executing unauthorized several-hundred-dollar cash ATM withdrawals.  When asked by Person 1 about the ATM withdrawals, GEROMINI misrepresented that the cash was used to pay for Victim Philadelphia Company office items.

9.     To effect the object of the scheme and artifice to defraud, the following acts, among others, were taken:

a.      On the following approximate dates, among others, GEROMINI prepared the following unauthorized wire transfers from the Bank B account to GEROMINI's Xanitos Bank A account by either: (i) entering the wiring instructions on the Bank B online portal before directing Person 1 to approve the wire transfers; or (ii) directing Person 1 to enter the instructions on the online portal, after which GEROMINI would approve the wire transfers:

i.   December 5, 2018 -- wire transfer in the amount of $7,250. On the Memo line, GEROMINI entered, or caused Person 1 to enter: "back pay";

ii.  January 2, 2019 -- wire transfer in the amount of $15,416.67.  On the Memo line, GEROMINI entered, or caused Person 1 to enter: "January pay resend";

iii. January 14, 2019 -- wire transfer in the amount of $40,000;

iv.  January 24, 2019 -- wire transfer in the amount of $15,416.67.  On the Memo line, GEROMINI entered, or caused Person 1 to enter: "p/r"; and

v.   May 2, 2019 -- wire transfer in the amount of $50,000.  On the Memo line, GEROMINI entered, or caused Person 1 to enter: "APP Bonus."

b.      In or around January 2019, GEROMINI approached the Chief Executive Officer ("CEO") of Victim Philadelphia Company and represented that, because Victim Philadelphia Company had entered into a contract, titled a "Statement of Work," with a Pennsylvania and New Jersey-based full-service medical laboratory (the "Laboratory"), GEROMINI was entitled to a bonus equal to 20% of his salary pursuant to a performance bonus clause in his employment contract.  However, despite GEROMINI's representations, a Statement of Work had not been executed at that time

6

between Victim Philadelphia Company and the Laboratory. Accordingly, GEROMINI was not entitled to any contractually-negotiated bonus. Nevertheless, after misrepresenting to the CEO that the Statement of Work had been executed, GEROMINI caused a wire transfer in the amount of $40,000 to credit his Xanitos Bank A account, as set forth in paragraph 9(a)(iii), above.

      c.    On the following approximate dates, and in the referenced amounts, GEROMINI incurred the following unauthorized charges, among others, to the Bank B account using the Bank B debit card:

    i.  April 11, 2019 -- $495 for GEROMINI's personal tax services from Optima Tax Relief;

    ii.  April 17, 2019 -- $5,000 for GEROMINI's personal tax services from Optima Tax Relief;

    iii.  May 1, 2019 -- $1,503.50 for GEROMINI's personal lodging expenses in Woodland, Texas while attending a triathlon; and

    iv.  May 10, 2019 -- $5,750 for a medical procedure at a suburban Philadelphia hospital (the "Hospital") for an acquaintance of GEROMINI.

      d.    In or around May 2019, GEROMINI falsely represented to Victim Philadelphia Company's CEO and to Person 1 that the charges incurred to the Hospital, as referenced in paragraph 9(c)(iv), above, were related to an agreement reached between Victim Philadelphia Company and the Hospital whereby Victim Philadelphia Company would pay the Hospital to conduct clinical trials at the Hospital.

e.      On the following approximate dates, and in the referenced amounts, GEROMINI executed the following unauthorized ATM withdrawals, among others, using the Bank B debit card:

     i.   October 10, 2018  -- ATM withdrawal of $803 from a Somers Point, New Jersey location;

     ii.   November 26, 2018 -- ATM withdrawal of $803 from a Somers Point, New Jersey location;

     iii.   January 8, 2019 -- ATM withdrawal of $703 from a Philadelphia, Pennsylvania location[1];

     iv.   January 29, 2019 -- ATM withdrawal of $710 from an Egg Harbor, New Jersey location;

     v.   April 22, 2019 -- ATM withdrawal of $803.50 from a Linwood, New Jersey location;

     vi.   April 23, 2019 – ATM withdrawal of $743 from a Woodlands, Texas location; and

     vii.   April 25, 2019 – ATM withdrawal of $603 from a Woodlands, Texas location.

---

[1] On or about each of the dates set forth in Paragraph 9(e)(i) through (iii), above, GEROMINI deposited the amounts withdrawn from Victim Philadelphia Company's Bank B account into his Xanitos Bank A account shortly after he executed the ATM withdrawals.

## Execution of the Scheme

10.     On or about the dates set forth below, for the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, in the District of New Jersey and elsewhere, the defendant,

JOSEPH GEROMINI,

did knowingly and intentionally transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds, each constituting a separate count of this Indictment:

| Counts | Approximate Date | Description of Interstate Wire Communication |
|--------|------------------|-----------------------------------------------|
| One | November 26, 2018 | ATM withdrawal of $803.00 from Somers Point, New Jersey |
| Two | December 5, 2018 | Wire transfer in the amount of $7,250 from Victim Philadelphia Company Bank B account to Xanitos Bank A Account. |
| Three | January 14, 2019 | Wire transfer in the amount of $40,000 from Victim Philadelphia Company Bank B account to Xanitos Bank A Account. |
| Four | May 10, 2019 | Bank B account debit card charge in the amount of $5,750 for services provided by the Hospital. |

In violation of Title 18, United States Code, Section 1343.

### Counts Five through Ten
### (Wire Fraud)

1.      The allegations set forth in Paragraph 1 and Paragraphs 4 through 9 of Counts One through Four of this Indictment are hereby repeated, realleged and incorporated as if fully set forth herein.

### The Scheme to Defraud

2.      From at least as early as in or about July 2018 through at least as early as in or about December 2018, in the District of New Jersey and elsewhere, the defendant,

JOSEPH GEROMINI,

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and, for the purpose of executing and attempting to execute such scheme and artifice, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, as more fully set forth below.

### Goal of the Scheme to Defraud

3.      The goal of the scheme and artifice to defraud was for GEROMINI to devise and operate a securities offering fraud to fraudulently obtain millions of dollars from investors of Victim Philadelphia Company before misappropriating a significant portion of those investor funds for his personal enrichment.

## Manner and Means of the Scheme to Defraud

4.     It was part of the scheme that GEROMINI made materially false and fraudulent representations to investors, and failed to disclose material facts that resulted in making his statements misleading, in order to induce the investors to entrust their monies to him in return for what the investors believed to be debt or equity in Victim Philadelphia Company.

5.     It was further part of the scheme that, while soliciting, and after having secured investments in Victim Philadelphia Company during the convertible note raise and Series A raise, GEROMINI misappropriated investor funds held in Victim Philadelphia Company's Bank B account by: (i) executing, or directing Person 1 to execute unauthorized wire transfers from Victim Philadelphia Company's account at Bank B to GEROMINI's Xanitos account at Bank A; (ii) using Victim Philadelphia Company's Bank B debit card to make unauthorized, non business-related purchases; and (iii) using Victim Philadelphia Company's Bank B debit card to execute unauthorized, non-business related ATM withdrawals.

6.     It was further part of the scheme that GEROMINI made false and misleading representations to investors regarding how their investment funds would be utilized.  Specifically, GEROMINI represented to investors that their funds would be used to further Victim Philadelphia Company's busines purposes.  For example, GEROMINI provided investors in Victim Philadelphia Company: (i) a due diligence prospectus that purported to include, among

11

other information, forecasted financial expenses for Victim Philadelphia Company, and (ii) a subscription agreement that purported to address, among other things, the manner in which the proceeds of debt or equity investments would be used to further Victim Philadelphia Company's business purposes. Similarly, GEROMINI represented to a victim investor that investment funds in Victim Philadelphia Company would be used for: (i) lab expenses; (ii) salaries for Victim Philadelphia Company employees; and (iii) developmental costs for Victim Philadelphia Company.  Contrary to these claims, GEROMINI did not invest all of the victim investors' funds in Victim Philadelphia Company, as he had promised the investors he would, but instead misappropriated a significant portion of these funds to pay for his own personal expenses.

7.    It was further part of the scheme that in connection with raising capital for Victim Philadelphia Company through debt and equity financing, GEROMINI provided investors with Victim Philadelphia Company's purported financial projections.  For example, GEROMINI discussed with investors, including Victim Investor 1 and Victim Investor 2, Victim Philadelphia Company's burn rate, that is, the rate at which Victim Philadelphia Company was spending its capital to finance its overhead before generating positive cash flow from Victim Philadelphia Company's operations.  In truth, as GEROMINI knew, forecasts GEROMINI made to investors, including Victim Investor 1 and Victim Investor 2, regarding Victim Philadelphia Company's estimated expenses, use of investor funds and burn rate, as discussed above, concealed GEROMINI's ongoing and repeated misappropriation of investor funds from

12

Victim Philadelphia Company's Bank B account, and were, accordingly, false and fraudulent, as well as material.  Further, as GEROMINI knew, these statements and material omissions were designed to induce continued investment in Victim Philadelphia Company.

8.      It was further part of the scheme that, at the direction of GEROMINI, victim investor funds were transmitted, including by wire transfer, into Victim Philadelphia Company's Bank B account, an account controlled by GEROMINI.  Once GEROMINI obtained these investor funds, he did not use the funds for the purposes he had represented to investors, as set forth in paragraphs 6 through 7 of Counts Five through Ten, above.  Instead, GEROMINI diverted a substantial portion of the victim investors' funds to himself, and not for any legitimate purposes related to Victim Philadelphia Company's business, all of which in a manner that was inconsistent with the representations made to investors.

9.      It was further part of the scheme that GEROMINI made or adopted at least one false and misleading statement that was issued publicly after investment funds were secured, in order to evade detection of the scheme, perpetuate the scheme, and keep the victim investor funds he received as a result of the fraud.

10.     To effect the object of the scheme and artifice to defraud, the following acts, among others, were taken:

        a. In or around August 2018, in connection with obtaining investment funds from Victim Investor 1 and Victim Investor 2 in Victim

Philadelphia Company's convertible note raise, GEROMINI provided Victim Investor 1 and Victim Investor 2 with, among other documents, subscription agreements, attached to which were "Risk Factors," including, among others, the following representations:

    i. "The Company is dependent on the talent and resources of its key managers and employees, specifically . . . Joe Geromini, its Chief Operations Officer."

    ii. "The Company currently intends to retain earnings to provide funds for the operation and expansion of its business and does not anticipate that it will pay dividends or make distributions in the foreseeable future."

    iii. "The Company has broad discretion as to the use of proceeds from this offering. None of the proceeds from this sale have been designated for specific purposes. Accordingly, investors in the Company will have to rely on the Company's management to apply a significant portion of these proceeds in an effective manner."

b. In or around September and October 2018, in connection with obtaining investment funds from Victim Investor 1 and Victim Investor 2 in Victim Philadelphia Company's Series A raise, GEROMINI provided Victim Investor 1 and Victim Investor 2 with, among other documents, subscription agreements, attached to which were the same, or substantially similar Risk Factors set forth in paragraph 10a of Counts Five through Ten, above.

c. On or about August 22, 2018, in connection with soliciting an investment from Victim Investor 1 in Victim Philadelphia Company's Series A raise, GEROMINI stated in an email that "[t]his [convertible note] subscription carries us through the clinical trial phase and Series A carries us into market development and Sales." However, GEROMINI purposely failed to mention that

part of Victim Investor 1's investment would be used for GEROMINI's personal expenses, and not for "market development and Sales."

d.   On or about August 28, 2018, following an investment presentation by GEROMINI and Victim Philadelphia Company's CEO to Victim Investor 1 and other potential investors, which took place at Philadelphia Company's offices, GEROMINI furnished Victim Investor 1 with a prospectus providing, among other information, Victim Philadelphia Company's financial projections and burn rate (the "Series A due diligence deck" or "deck"). Although GEROMINI was responsible for creating and reviewing the accuracy of the financial projections and burn rate before including them in the Series A due diligence deck, GEROMINI purposely failed to disclose to Victim Investor 1 that the financial figures in the deck did not reflect funds that GEROMINI had already misappropriated and diverted, or funds that he intended in the future to misappropriate and divert, to Bank A for his personal enrichment.

e.   On or about September 7, 2018, Philadelphia Company's CEO sent an email to prospective investors, including Victim Investor 1, on which GEROMINI was copied as a recipient, promoting the Series A raise, and including as an attachment to the email a Series A term sheet.  Under the caption: "Use of Proceeds," the term sheet stated, as follows: "The company intends to use the proceeds of this investment to pursue the Company's business plan to further develop and commercialize its products and services." Following Victim Philadelphia Company's dissemination of the term sheet, GEROMINI purposely failed to inform investors, including Victim Investor 1,

that the term sheet did not reflect GEROMINI's use of investment proceeds for his own enrichment, rather than to "develop and commercialize [Victim Philadelphia Company's] products and services."

f.  In or around late September 2018, GEROMINI told Victim Investor 1 that investment funds for the Series A raise would be used by Victim Philadelphia Company for lab expenses, employee salaries, and developmental costs, but purposely failed to mention that investment funds would also be used by GEROMINI, as they had been used in the past, to fund his personal, non-business related expenses.

g.  In or around late September 2018, in response to an Inquiry by Victim Investor 1, GEROMINI stated that Victim Philadelphia Company paid him a salary of $180,000 per year, but purposely failed to mention to Victim Investor 1 that this salary did not include the tens-of-thousands of dollars of investor funds misappropriated by GEROMINI for his own enrichment.

h.  On or about September 12, 2018, in response to an observation by Victim Investor 2 that the $25 million valuation of Victim Philadelphia Company in connection with the Series A raise was "rich versus my most recent investment(s) in you guys.  Still mulling it over[,]" GEROMINI stated that Victim Philadelphia Company was "incredibly confident in this [valuation]" and that Victim Philadelphia Company's "lead investor for Series A is most comfortable and has committed 500/600k."  Two days later, on or about September 14, 2018, Victim Investor 1, speaking on behalf, and as a member of, the lead investor for Victim Philadelphia Company's Series A raise (the

"Victim Investor Pool"), addressed the $25 million valuation, as follows: "I was surprised to see the valuation at $25 million.  I thought you would come in between $10 and $20 million.  I think $25 million is too aggressive.  Not that much has changed since you had a $4 million valuation [in connection with the convertible note raise]."  After receiving Victim Investor 1's email, GEROMINI purposely failed to correct his September 12, 2018 misrepresentation to Victim Investor 2 that the lead investor was "most comfortable" with the $25 million valuation.

  i. On or about October 9, 2018, while soliciting a Series A raise investment from Victim Investor 2, GEROMINI sent an email to Victim Investor 2 describing Victim Philadelphia Company's burn rate, as follows:  "Our burn going into Q1 is at 60 k but yesterday we verbally committed to a deal w ["Hospital A"] and their lab group . . . We will run a second post FDA submission LFT trial in their labs and begin our CMP clinical trial.  Our Agreement will be our first sales Agreement 'Pending FDA Approval.'  Once approved we will roll out within their system."  Victim Investor 2 responded to this email, inquiring, as follows: "Apologies....does that help burn rate or increase it?"  GEROMINI responded, stating: "Will increase.  I'm adjusting burn to 72500 beginning in February 2019."  GEROMINI's representations to Victim Investor 2 were materially false inasmuch as (i) they failed to disclose GEROMINI's theft of investor funds; and (ii) misrepresented that a deal had been struck with Hospital A and its lab group, when, at the time the statement

was made, no such agreement had been reached between Victim Philadelphia Company and Hospital A and its lab group.

j.   On or about November 5, 2018, in connection with a public release issued by Victim Philadelphia Company announcing the close of the Series A raise, GEROMINI stated, or adopted the statement, that: "The operations efficiencies our team has been able to achieve will ensure that every penny of this funding will be used in a meaningful, productive manner that helps to bring our technology closer to fruition."  However, GEROMINI purposely failed to disclose that not "every penny" of the Series A raise was used in a "meaningful" or "productive" manner, given that much of the funding was used by GEROMINI for his own personal, non business-related expenses.

k.   Based on the above material misrepresentations, among others: (i) on or about August 10, 2018, Victim Investor 1 caused a check in the amount of $100,000 payable to Victim Philadelphia Company to be remotely deposited to Victim Philadelphia Company's Bank C account; (ii) on or about August 13, 2018, Victim Investor 2 caused $75,000 to be wired to Victim Philadelphia Company's Bank B account; and (iii) on or about August 14, 2018, an angel investor group, of which Victim Investor 2 was a member, caused $162,500 to be wired to Victim Philadelphia Company's Bank B account.

l.   After receiving Victim Investor 1, Victim Investor 2, and the angel investor group's money, as set forth in paragraph 10k of Counts Five through Ten, above, GEROMINI converted a portion of these funds to his own use, or otherwise used a portion of the funds in a manner that was inconsistent with

18

the representations made to the victim investors.  For example, within approximately two weeks of Victim Philadelphia Company's receipt of the funds, GEROMINI electronically transferred, or directed Person 1 to electronically transfer investor funds on three separate occasions to GEROMINI's Xanitos account at Bank A for his personal use, as follows: (i) two separate transfers each in the amount of $3,495 on or about August 21, 2018; and (ii) $15,285 on or about August 28, 2018.

m. Further, based on the above material misrepresentations, among others: (i) on or about October 3, 2018, Victim Investor 1 caused a check in the amount of $50,027.76 payable to Victim Philadelphia Company to be remotely deposited to Victim Philadelphia Company's Bank B account; (ii) on or about October 3, 2018, the Victim Investor Pool caused a check in the amount of $500,005.71 payable to Victim Philadelphia Company to be remotely deposited to Philadelphia Company's Bank B account; and (iii) on or about October 26, 2018, Victim Investor 2 caused $300,000 to be wired to Victim Philadelphia Company's Bank B account.

n. After receiving Victim Investor 1, Victim Investor 2, and the Victim Investor Pool's money, as set forth in paragraph 10m of Counts Five through Ten, above, GEROMINI converted a portion of these funds to his own use, or otherwise used a portion of the funds in a manner that was inconsistent with the representations made to the victim investors.  For example, within several weeks of receiving the funds, GEROMINI on four separate occasions electronically transferred, or directed Person 1 to electronically transfer

investor funds to GEROMINI's Xanitos account at Bank A for his personal use, as follows: (i) $3,625 on or about November 13, 2018; (ii) $3,625 on or about November 19, 2018; (iii) $3,625 on or about November 27, 2018; and (iv) $7,250 on or about December 5, 2019.

      o.   Additionally, while soliciting, and immediately after receiving investment funds from, among others, Victim Investor 1, Victim Investor 2, and the Victim Investor Pool, as set forth above, GEROMINI converted a portion of these funds to his own use, or otherwise used a portion of the funds in a manner that was inconsistent with the representations made to the victim investors, by, among other transactions: (i) using Victim Philadelphia Company's Bank B debit card to execute numerous ATM withdrawals from Victim Philadelphia Company's Bank B account at bank branches located in New Jersey, as follows: (a) $103 on or about September 21, 2018, (b) $100 on or about September 24, 2018, (c) $703 on or about October 10, 2018, (d) $803 on or about October 23, 2018, and (e) $803 on or about November 26, 2018; and (ii) using Victim Philadelphia Company's Bank B debit card to make unauthorized, non business-related purchases, such as incurring an $87.37 charge to a pizzeria in Moorestown, New Jersey on or about October 23, 2018.

## Execution of the Scheme

11.     On or about the dates set forth below, for the purpose of executing

and attempting to execute the aforesaid scheme and artifice to defraud, in the

District of New Jersey and elsewhere, the defendant,

JOSEPH GEROMINI,

did knowingly and intentionally transmit and cause to be transmitted by

means of wire, radio, and television communication in interstate and foreign

commerce, the following writings, signs, signals, pictures, and sounds, each

constituting a separate count of this Indictment:

| Counts | Approximate Date | Description of Interstate Wire Communication |
| --- | --- | --- |
| Five | August 10, 2018 | Victim Investor 1 caused a payment in the amount of $100,000 to be remotely deposited to Victim Philadelphia Company's Bank C account. |
| Six | August 13, 2018 | Victim Investor 2 caused a payment in the amount of $75,000 to be wire transferred to Victim Philadelphia Company's Bank B account. |
| Seven | August 14, 2018 | An angel investor group, of which Victim Investor 2 was a member, caused a payment in the amount of $162,500 to be wire transferred to Victim Philadelphia Company's Bank B account. |
| Eight | October 3, 2018 | Victim Investor 1 caused a payment in the amount of $50,027.76 to be remotely deposited to Victim Philadelphia Company's Bank B account. |

| Nine | October 3, 2018 | Victim Investor Pool caused a payment in the amount of $500,005.71 to be remotely deposited to Victim Philadelphia Company's Bank B account. |
| Ten | October 26, 2018 | Victim Investor 2 caused a payment in the amount of $300,000 to be wire transferred to Victim Philadelphia Company's Bank B account. |

In violation of Title 18, United States Code, Section 1343.

## Count Eleven
### (Securities Fraud)

1.       The allegations set forth in Paragraphs 1 and 4 through 9 of Counts One through Four, and Paragraphs 3 through 10 of Counts Five through Ten of this Indictment are hereby repeated, realleged and incorporated as if fully set forth herein.

2.       In or about October 2018, in the District of New Jersey, and elsewhere, the defendant,

JOSEPH GEROMINI,

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, knowingly and willfully used manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, in connection with the purchases and sales of securities, namely, shares of Philadelphia Company stock, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, namely, Victim Investor 1, a purchaser of equity shares of stock in Victim Philadelphia Company.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Count Twelve
### (Securities Fraud)

1.      The allegations set forth in Paragraphs 1 and 4 through 9 of Counts One through Four, and Paragraphs 3 through 10 of Counts Five through Ten of this Indictment are hereby repeated, realleged and incorporated as if fully set forth herein.

2.      In or about October 2018, in the District of New Jersey, and elsewhere, the defendant,

JOSEPH GEROMINI,

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, knowingly and willfully used manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, in connection with the purchases and sales of securities, namely, shares of Philadelphia Company stock, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, namely, Victim Investor 2, a purchaser of equity shares of stock in Victim Philadelphia Company.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5.

## FORFEITURE ALLEGATION

1.      As a result of committing the offenses charged in Counts One

through Twelve of this Indictment, the defendant,

JOSEPH GEROMINI,

shall forfeit to the United States, pursuant to Title 18, United States Code,

Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all

property, real and personal, that constitutes or is derived from proceeds

traceable to the commission of the said offenses, and all property traceable

thereto.

## SUBSTITUTE ASSETS PROVISION

2.      If any of the above-described forfeitable property, as a result of any

act or omission of the defendant:

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with a third party;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be

divided without difficulty;

the United States shall be entitled, pursuant to 21 U.S.C. § 853(p) (as incorporated by 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b)), to forfeiture of any other property of the defendants up to the value of the above-described forfeitable property.

A TRUE BILL

Grand Jury Foreperson

RACHAEL A. HONIG
ACTING UNITED STATES ATTORNEY

27

**CASE NUMBER: 21- 487**

# United States District Court
# District of New Jersey

## UNITED STATES OF AMERICA

### v.

### JOSEPH GEROMINI

# INDICTMENT
# FOR

**18 U.S.C. § 1343,**
**15 U.S.C. §§ 78j(b) and 78ff(a),**
**and 17 C.F.R. § 240.10b-5**

**A True Bill,**

_____
**Foreperson**

RACHAEL A. HONIG
ACTING UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

ERIC A. BODEN
ASSISTANT U.S. ATTORNEY
TRENTON, NEW JERSEY
(609) 989-2190